ABK
F.# 2014R00236

**15 M 0610**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – X

IN THE MATTER OF AN APPLICATION FOR A
SEARCH WARRANT FOR:

ONE WHITE SAMSUNG GALAXY S5
SMARTPHONE LABELED DEA EXHIBIT N-65;

ONE MOTOROLA SMARTPHONE LABELED DEA
EXHIBIT N-66;

ONE APPLE IPHONE IN A GOLD-COLORED CASE
LABELED DEA EXHIBIT N-67;

ONE SILVER-COLORED MOTOROLA CELLULAR
TELEPHONE LABELED DEA EXHIBIT N-68;

ONE BLACK PALM CELLUAR TELEPHONE
LABELED DEA EXHIBIT N-69;

ONE BLACK NOKIA CELLULAR TELEPHONE
LABELED DEA EXHIBIT N-70;

ONE GRAY SAMSUNG GALAXY NOTE II
SMARTPHONE LABELED DEA EXHIBIT N-71;

ONE BLACK ALCATEL CELLULAR TELEPHONE
LABELED DEA EXHIBIT N-72;

ONE WHITE LG SMARTPHONE LABELED DEA
EXHIBIT N-78; and

ONE BLACK SAMSUNG CELLPHONE LABELED
DEA EXHIBIT N-84,

SEIZED ON OR ABOUT JUNE 11, 2014 FROM THE
PREMISES LOCATED AT 41-21 149TH STREET,
FIRST FLOOR, IN QUEENS, NEW YORK.

– – – – – – – – – – – – – – – – – – – – X

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR A SEARCH
WARRANT

(Fed. R. Crim. P. 41)

EASTERN DISTRICT OF NEW YORK, SS:

BENJAMIN X. YU, being duly sworn, deposes and states that he is a Special Agent with the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such.

1.      I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—namely, the above-referenced electronic devices described in Attachment A—which are currently in law enforcement possession in the Eastern District of New York, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Drug Enforcement Administration ("DEA"). I have been a DEA Special Agent for approximately 18 years and am responsible for investigating narcotics trafficking and money laundering, as well as other offenses. This Affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      During my tenure with the DEA, I have participated in narcotics investigations during the course of which I have: (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, records of narcotics, money laundering transactions and firearms have been found; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped conversations of drug traffickers and

2

reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking and money laundering. Through my training, education, and experience, I have become familiar with (a) the manner in which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

4. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. All referenced transcripts are in draft translation and form.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is as follows: ONE WHITE SAMSUNG GALAXY S5 SMARTPHONE LABELED DEA EXHIBIT N-65; ONE MOTOROLA SMARTPHONE LABELED DEA EXHIBIT N-66; ONE APPLE IPHONE IN A GOLD-COLORED CASE LABELED DEA EXHIBIT N-67; ONE SILVER-COLORED MOTOROLA CELLULAR TELEPHONE LABELED DEA EXHIBIT N-68; ONE BLACK PALM CELLUAR TELEPHONE LABELED DEA EXHIBIT N-69; ONE BLACK NOKIA CELLULAR TELEPHONE LABELED DEA EXHIBIT N-70; ONE GRAY SAMSUNG GALAXY NOTE II SMARTPHONE LABELED DEA EXHIBIT N-71; ONE BLACK ALCATEL CELLULAR TELEPHONE LABELED DEA EXHIBIT N-72; ONE WHITE LG SMARTPHONE LABELED DEA EXHIBIT N-78; and ONE BLACK SAMSUNG

3

CELLPHONE LABELED DEA EXHIBIT N-84, SEIZED ON OR ABOUT JUNE 11, 2014 FROM THE PREMISES LOCATED AT 41-21 149TH STREET, FIRST FLOOR, IN QUEENS, NEW YORK (collectively, the "DEVICES"). The DEVICES are in the custody of law enforcement officials in Brooklyn, New York.

6.     The applied-for warrant would authorize the forensic examination of the DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.     On July 9, 2014, a grand jury empanelled in Eastern District of New York indicted the defendant, JUN FENG, also known as "KEVIN," and others, for conspiring to distribute and possessing with the intent to distribute a controlled substance containing methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(b)(1)(C) and 846. (See Docket No. 14-CR-387 (MKB)). The Indictment charges that the conspiracy occurred in or about and between approximately July 2013 and June 2014. The investigation is ongoing.

8.     During the course of the investigation leading to the charges against FENG and others, law enforcement agents developed evidence indicating that FENG resided at 41-21 149th Street, First Floor, Queens, New York (the "Subject Premises") and used the Subject Premises to store and distribute controlled substances. On two occasions described below—February 27, 2014 and April 27, 2014—a distributor of crystal methamphetamine ("crystal meth") named HAN WOON NG ("NG") met with FENG at the Subject Premises

4

shortly before NG sold crystal meth to an agent acting in an undercover capacity (the "UC");

NG has also been indicted as part of the above-mentioned charged drug distribution

conspiracy.  On both occasions, surveillance and intercepted wire communications indicated

that FENG was the source of the crystal meth and that NG obtained the crystal meth from

FENG's residence, Subject Premises.

**February 27, 2014 Crystal Meth Transaction**

9.     On February 27, 2014, the UC met with NG, a distributor of crystal

meth.  The UC asked NG whether NG could obtain crystal meth.  NG suggested that they

meet again later that day, at about 7:00 or 8:00 p.m., and made several telephone calls in the

UC's presence.[1]  Included among these calls was a call to FENG.  The following is an

excerpt of that call:

| FENG: | Hello? |
|---|---|
| NG: | Hey, that, that, that, that...will you be able to get it?  It's not, it's not, it's not the "Seafood."  The other "Pork". |
| FENG: | "Pork"... How much do you need?  The order that I asked yesterday is still not placed today. |
| NG: | I have not decided yet. |

---

[1] All calls referenced in this Affidavit were lawfully recorded pursuant to court-authorized wiretaps.  Not all relevant calls are described herein.  Moreover, for those calls described, not all relevant portions of such conversations have been described.  To the extent that quotations are used in the descriptions below, the quoted segments are based on draft line sheets and reviews of recordings and not final transcripts.  Quoted passages include translations from Cantonese, Mandarin and Fujianese in draft form.  Also, dates and times are approximate and based on the monitoring equipment at the time the call was intercepted.

| FENG: | It hasn't been deliver[ed] yet. |
| NG: | I know. Will it be available tonight? |
| FENG: | I don't know. How much stuff do you want to order? |
| NG: | Right now, one quarter. |
| FENG: | [UNINTELLIGIBLE] |
| NG: | A quarter or a half. |
| FENG: | It's better to take half. It's more worth it. |
| NG: | I know that, but when will you have it? Today I need to tell him. I am with him right now at the shopping place. |
| FENG: | Uh…okay. I will ask. I will call you when I am done with the phone call. |

10.     Based on my training, experience and familiarity with this investigation, I believe NG called FENG to discuss the acquisition of narcotics for the UC, using the code words "pork" and "seafood" to indicate different kinds of narcotics. NG also added that he wanted a "quarter" or a "half;" based on my training, experience and the investigation to date, I believe that the words "quarter" and "half" refer to a quarter ounce (7 grams) or a half ounce (14 grams), which are common weights in drug transactions.

11.     After an additional call to FENG, NG left the UC and agreed to meet with the UC later that afternoon/evening. Over the next few hours, agents from the DEA surveiled NG as he drove to several different locations in Queens, New York, including the Subject Premises.

12.     At approximately 7:30 p.m., after NG had visited and left the Subject Premises, NG and his associate and co-defendant SZE WONG TSUI ("TSUI") spoke on the

6

telephone to discuss transportation to the meeting site.  The following is an excerpt of one of their conversations:

| | |
|---|---|
| TSUI: | What now? |
| NG: | No, it's better to wait for you, better to wait for you.  Better to wait for me. |
| TSUI: | Wait for me again? Where are you? |
| NG: | Deliver it there and I'll collect...collect the money. |
| TSUI: | Where are you? |
| NG: | Home. I'll wait for you at home. |
| TSUI: | Ok, ok. Mm. Bye. |

13.     Shortly before 8 p.m. that evening, TSUI drove to NG's residence, picked up NG, and then drove NG to a Sheraton Hotel in Flushing, Queens to meet with the UC.  Agents from the DEA surveiled the hotel and saw NG enter and exit the hotel while TSUI stayed in the car.  Once he was inside the hotel, NG sold the UC approximately 8 grams of crystal meth.

14.     The next day, February 28, 2014, FENG called NG.  During this conversation, FENG asked NG, "So what did he say about the seafood that you brought over."  Based on my training and experience and the investigation so far, I believe that FENG called NG because he was curious to learn what the UC thought of the narcotics that FENG had provided NG for the UC.

## April 17, 2014 Crystal Meth Transaction

15.     On April 17, 2014, at approximately 4:40 p.m., the UC, a cooperating witness ("CW") and NG met at the Sheraton Hotel in Flushing, Queens to negotiate an additional narcotics transaction.  During the meeting, the UC requested two ounces of crystal meth.  At approximately 6:05 p.m., NG left the hotel.  A few minutes later, at approximately 6:13 p.m., NG called TSUI.  The following is an excerpt of that conversation:

| | |
|---|---|
| NG: | What's going on big brother Jimmy? |
| TSUI: | What? |
| NG: | Where are you? |
| TSUI: | I'm home, what now? |
| NG: | Nothing, I'm coming back home. |
| TSUI: | Fine, just come back. |
| NG: | I have something to be work on.  I'm working on something. Motherfucker, If I should call "K". |
| TSUI: | What does it have to do with K? |
| NG: | Ah... Uncle Guai doesn't have that much.  He doesn't have that much. |
| TSUI: | K doesn't have it. |
| NG: | He can't get it? |
| TSUI: | You can ask him, but I can tell you for sure that he doesn't have it. |
| NG: | Oh... |

8

| | |
|---|---|
| TSUI: | If he tells you that he does have some, then he's slapping himself across the face because he was telling me he doesn't have any this whole time. Is he really that stupid? |
| NG: | Then how come last time he said he has some? [LAUGHS] |
| TSUI: | He told me he has none. |
| NG: | Remember last time when I borrow three hundred dollars from you? |
| TSUI: | Yeah. |
| NG: | That's when I asked him to help me. |
| TSUI: | Well, he told me he doesn't have any every time. |

16.     Based on my training, experience and the investigation to date, NG and TSUI were discussing whether "K,"—which I believe is short for "Kevin" (FENG's alias)— has narcotics to satisfy NG's order.

17.     Once NG and TSUI finished their telephone call, NG immediately called FENG. The following is an excerpt of that conversation:

| | |
|---|---|
| FENG: | You can speak. |
| NG: | Can you go out and do something? |
| FENG: | What kind of thing do you want me to do? Is it "Pork"? |
| NG: | I'm asking you to help me to do something. Actually it's better if I can come over in person and talk to you it's better. |
| FENG: | I'm home. |

9

| NG: | Okay, I can be there in two minute[s] at your home. |
| FENG: | Yeah, okay. |

18.     Based on my training, experience and the investigation to date, NG and FENG again used the word "pork" as code for narcotics. Moreover, when NG said that he could "be there in two minutes[s] at your home," NG was referring to the Subject Premises. Then, a few minutes after NG and FENG completed their telephone call, agents surveiled NG as he arrived at the Subject Premises.

19.     As with the prior transaction, after NG had visited and left the Subject Premises, NG and TSUI spoke on the phone to discuss transportation to the meeting site. Agents then observed TSUI and NG drive to the Sheraton Hotel. As they drove to the hotel, NG called FENG; the following is an excerpt of that telephone call:

| NG: | Uh, I'm on Parson and Roosevelt, on my way going down, (I'm) about to arrive. |
| FENG: | Uh, you come to… You will be coming to 3370, right? |
| NG: | 3370? I have to drive back again and turn around. That, that, those newspapers, newspapers are still over there. |
| FENG: | Can't you just come over here? |
| NG: | Me? He is there eating dinner. He… |
| FENG: | Where? |
| NG: | He's having dinner underneath the hotel. |
| FENG: | Which hotel? |
| NG: | That one, Sheraton, Sheraton. |

10

| | |
|---|---|
| FENG: | How far is it from Sheraton to over here? |
| NG: | I, I asked Brother Jimmy to drive. |
| FENG: | Okay. |
| NG: | Would it be a bit better if I waited for you at the parking lot? |
| FENG: | I'm afraid. |
| NG: | No, you go down only when you see me. |
| FENG: | Okay, fine. |
| NG: | No, you, you are not going to see him, only me. |
| | [VOICES OVERLAP] |
| FENG: | I, I won't see any one, all right? |
| NG: | Won't see anyone, of course, you certainly won't see anyone, okay? (You) will only see me. I'll go down to take care of it and will get back to give, give you the newspapers. |
| FENG: | Uh, fine, bye. |

20.    Based on my training, experience and the investigation to date, I believe that NG encouraged FENG to come to the hotel so that NG could give FENG "newspapers," which appears to be a code word for money. During this conversation, FENG expressed fear at the prospect of coming to the hotel but NG assured FENG that FENG wouldn't see anyone other than himself (NG).

21.    Once NG, TSUI and FENG arrived at the Sheraton Hotel, agents surveiled NG as he walked over to FENG's vehicle and talked with FENG. NG then went

11

into the Sheraton Hotel alone. Once he was inside the hotel, NG gave the UC 42 grams of crystal meth in exchange for $4600.

22. Based on the foregoing, on June 6, 2014, the Honorable Marilyn D. Go, United States Magistrate Judge for the Eastern District of New York, issued a warrant authorizing the search of the Subject Premises. (See Docket No. 14-M-530.) Among other things, the June 6, 2014 search warrant authorized the seizure of cellular telephones and their stored information.

23. On or about June 11, 2014, law enforcement agents executed the June 6, 2014 search warrant on the Subject Premises. During their search, agents recovered, among other things, the DEVICES, together with suspected crystal methamphetamine, a bundled stack of United States currency, weighing devices, baggies, packaging material and other indicia of the sale, transportation and use of crystal meth.

24. Based on my training and experience, discussions with other law enforcement officers and my familiarity with this investigation, I understand that individuals involved in conspiracies to possess with intent to distribute narcotics often do not act alone and often communicate with co-conspirators by means of cellular telephones such as the DEVICES. They commonly maintain records that reflect names, addresses, or telephone numbers of their associates in their cellular telephones. They also commonly maintain records of communications such as call logs, chats and text messages in their cellular telephones. They also commonly take photographs of themselves, their associates, or their property using their cellular telephones. These individuals often maintain these records of

12

communication and photographs in their possession and in their cellular telephones for a substantial period of time.

25.    Further, based on my knowledge, training and experience, I know that the DEVICES can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time. Even when deleted by the user, this information can sometimes be recovered with forensic tools.

26.    Law enforcement authorities have made efforts to identify the particular device or devices used by FENG during the above-described calls. In particular, law enforcement authorities have subpoenaed records associated with the telephone number used by FENG during the above-described calls; the make and model of the telephone device(s) was specifically requested. Despite these efforts, to date, law enforcement authorities have been unable to identify the device(s) associated with the above-described calls.

27.    The DEVICES are currently in the lawful possession of law enforcement authorities and were seized during the execution of the search warrant at the Subject Premises on June 11, 2014. Therefore, while the DEA might already have all necessary authority to examine the DEVICES, I seek this additional warrant out of an abundance of caution to be certain that an examination of the DEVICES will comply with the Fourth Amendment and other applicable laws.

28.    Since their seizure, the DEVICES have been in sealed evidence bags in law enforcement custody. In my training and experience, I know that the DEVICES have

13

been stored in a manner in which their contents are, to the extent material to this

investigation, in substantially the same state as they were when the DEVICES first came into

the possession of the DEA. There is therefore probable cause to believe that the DEVICES

contain evidence, fruits, and instrumentalities of federal narcotics trafficking offenses,

including a conspiracy to distribute and possessing with the intent to distribute a controlled

substance containing methamphetamine, a Schedule II controlled substance, in violation of

Title 21, United States Code, Sections 841 and 846.

## TECHNICAL TERMS

       29.    Based on my training and experience, I use the following technical

terms to convey the following meanings:

       a.    Wireless telephone: A wireless telephone (or mobile telephone,

or cellular telephone) is a handheld wireless device used for voice and data communication

through radio signals. These telephones send signals through networks of

transmitter/receivers, enabling communication with other wireless telephones or traditional

"land line" telephones. A wireless telephone usually contains a "call log," which records the

telephone number, date, and time of calls made to and from the phone. In addition to

enabling voice communications, wireless telephones offer a broad range of capabilities.

These capabilities include: storing names and phone numbers in electronic "address books;"

sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and

storing still photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing and

14

downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.     Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another

15

location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

16

       f.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer device attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

       g.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

     30.     Based on my training, experience and research, I know that electronic devices such as the DEVICES have capabilities that allow them to serve wireless telephones, digital cameras, portable media players, GPS navigation devices, and/or PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

     31.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have

17

been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

32.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICES were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the DEVICES because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.

b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer device is

18

evidence may depend on other information stored on the computer and the application of knowledge about how a computer device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

33.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the DEVICES to human inspection in order to determine whether it is evidence described by the warrant.

34.     Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

19

## CONCLUSION

WHEREFORE, I respectfully submit that this Affidavit supports probable

cause for a search warrant authorizing the examination of the DEVICES described in

Attachment A to seek the items described in Attachment B.

BENJAMIN X. YU
Special Agent
Drug Enforcement Administration

Sworn to before me this
___6___th day of July, 2015


THE HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE

20

## ATTACHMENT A

The properties to be search are described as follows:  ONE WHITE SAMSUNG GALAXY S5 SMARTPHONE LABELED DEA EXHIBIT N-65; ONE MOTOROLA SMARTPHONE LABELED DEA EXHIBIT N-66; ONE APPLE IPHONE IN A GOLD-COLORED CASE LABELED DEA EXHIBIT N-67; ONE SILVER-COLORED MOTOROLA CELLULAR TELEPHONE LABELED DEA EXHIBIT N-68; ONE BLACK PALM CELLUAR TELEPHONE LABELED DEA EXHIBIT N-69; ONE BLACK NOKIA CELLULAR TELEPHONE LABELED DEA EXHIBIT N-70; ONE GRAY SAMSUNG GALAXY NOTE II SMARTPHONE LABELED DEA EXHIBIT N-71; ONE BLACK ALCATEL CELLULAR TELEPHONE LABELED DEA EXHIBIT N-72; ONE WHITE LG SMARTPHONE LABELED DEA EXHIBIT N-78; and ONE BLACK SAMSUNG CELLPHONE LABELED DEA EXHIBIT N-84, SEIZED ON OR ABOUT JUNE 11, 2014 FROM THE PREMISES LOCATED AT 41-21 149TH STREET, FIRST FLOOR, IN QUEENS, NEW YORK (collectively, the "DEVICES").  This warrant authorizes the forensic examination of the DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the DEVICES described in Attachment A that relate to violations of Title 21, United States Code, Sections 841 and 846 and involve JUN FENG, also known as "KEVIN," and others, including:

        a.   lists of customers and related identifying information;

        b.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

        c.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

        d.   any information recording the defendants' schedule or travel;

        e.   any information recording the defendant communications with any co-defendant co-conspirator; and

        f.   all bank records, checks, credit card bills, account information, and other financial records.

2.      Records and evidence of user attribution showing who used or owned the DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, records, documents, and browsing history; and

3.      Records evidencing the use of the Internet Protocol addresses, including:

        a.   records of Internet Protocol addresses used;

        b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user

entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2